(C. D. 1796)

DUREZ PLASTICS & CHEMICALS *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 26, 1956)

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Alfred A. Taylor, Jr.*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This case raises the question of the proper rate of duty to be imposed upon certain imported merchandise, described as rag dust, cotton waste, or flock. The collector of customs at the port of entry classified said merchandise as manufactures of cotton, not specially provided for, and, accordingly, assessed duty thereon either at the rate of 40 per centum ad valorem, within the provisions of paragraph 923 of the Tariff Act of 1930, or at the rate of 30 per centum ad valorem, pursuant to said paragraph 923, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, supplemented by Presidential proclamation of October 2, 1951, 86 Treas. Dec. 357, T. D. 52836, depending upon the date of importation.

Plaintiff claims alternatively that this merchandise is cotton waste, manufactured or otherwise advanced in value, which is provided for in paragraph 901 (c) of said act, at the rate of 5 per centum ad valorem, or that it is an unenumerated manufactured article, dutiable at the rate of 20 per centum ad valorem, within the provisions of paragraph 1558 of said act, or at the rate of 10 per centum ad valorem, by virtue of said paragraph 1558, as modified by said Torquay protocol, supplemented by Presidential proclamation of September 18, 1951, 86 Treas. Dec. 347, T. D. 52827.

Counsel for the Government also invokes the provisions of said paragraph 1558, or as modified, by way of a classification alternative to that made by the collector.

The foregoing tariff provisions read as follows:

PAR. 901. (c)  Cotton waste, manufactured or otherwise advanced in value, cotton card laps, sliver, and roving, 5 per centum ad valorem.

PAR. 923.  All manufactures, wholly for in chief value of cotton, not specially provided for, 40 per centum ad valorem.  [Rate reduced to 30 per centum ad valorem, by modification, *supra*.]

PAR. 1558.  That there shall be levied, collected, and paid * * * on all articles manufactured in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.  [Insofar as here pertinent, this rate has been reduced to 10 per centum ad valorem, by modification, *supra*.]

A sample of this importation is in evidence as plaintiff's exhibit 4. It consists of a fine, grayish-blue powder, which the record shows was produced by grinding a multicolored mixture of approximately 90 per centum cotton gingham cuttings and 10 per centum locknit cotton cuttings in special rotary cutters, and then subjecting the grindings to a process of sieving.  It is not dyed.  Representative pieces of the cuttings from which the merchandise at bar is derived are in evidence as plaintiff's exhibit 3.

Two witnesses testified on behalf of plaintiff.  The first of these was Roger Achille Lion, whose testimony was introduced by way of answers to interrogatories addressed to him at Paris, France (plaintiff's exhibits 1, 2, and 5).  He stated that he is the commercial manager of S. N. U. F. T., the concern which produced the merchandise at bar for shipment to Durez Plastics & Chemicals, plaintiff herein.  Lion's evidence shows him to be well qualified in his field.  In addition to passing his "baccalauréat" examinations, he has had training in several textile enterprises in France, Spain, and Great Britain, as well as exclusive responsibility for the domestic and export business of S. N. U. F. T. for the past 5 years.  The witness described himself as a "specialist in textiles, wastes and material for spinning, weaving and for paper manufacture."

Concerning the cotton cuttings used to produce the instant merchandise, this witness stated that it was entirely new waste, which was not suitable for spinning into cotton threads or yarn or for weaving into fabrics, for the reason that the raw material is too hard and can not produce a fiber long enough to be spun.

Plaintiff's second witness was Irving Hinerfeld, owner of the Mundane Co., a firm engaged for the past 20 years in the manufacture of flock. He is also a vice president of S. N. U. F. T., the shipper of the instant merchandise, and had previously engaged in the business of importing and exporting cotton textile wastes of all kinds.

This witness defined flock as decimated or ground cotton and rayon fiber, which can be produced in several different grades. He described the imported merchandise as "filler flock," made primarily from cotton cuttings which are fed into a rotary cutter and ground or cut into fine powder. Not only had he seen the French process of producing this type of filler flock at least a half-dozen times, but his firm manufactures filler flock from cotton cuttings on the same machines in this country.

As to cuttings of the kind represented by plaintiff's exhibit 3, Hinerfeld stated that they are new waste material from the manufacture of cotton garments which can be used in making paper, vulcanized fiberboard, roofing felt, and cotton flock, but are not suitable for picking or garnetting into shoddy, or for use in the production of cotton yarn or thread. According to this witness, it is commercially impractical to use this type of cotton cuttings for the manufacture of cotton yarn, for the reason that the colors are primarily fast colors, which can not be stripped. Moreover, in view of the fact that the cuttings are very tightly woven, putting them through a picker or garnetter would produce, not fiber, but little nubs or balls.

Hinerfeld testified further that filler flock, such as exhibit 4, is used primarily as a filler in phenolics, which is commonly known as Bakelite, to impart impact value, to prevent it from shattering. It is also used as a binder in low-priced shellac talking-machine records. For these purposes, the color of the filler flock is immaterial, as practically all phenolics are made into black or brown articles. Neither does the tightness of the weave in the cuttings adversely affect the grinding operation by which filler flock is produced. He distinguished filler flock of the type of plaintiff's exhibit 4 from flock used for coating on the basis of the length of the fiber and its color. Flock for sueding or coating must be of sufficient length so as not to be completely absorbed by the adhesive which first coats the cloth or paper, in order that a velvetlike effect may be created. Moreover, since sueding flock is dyed into colors, it must be white in its original state. Neither

of these qualities is essential for filler flock. Samples of articles coated with sueding flock are in evidence as plaintiff's exhibit 6.

On the subject of value, the witness testified that cotton cuttings, such as plaintiff's exhibit 3, have a value in this country of 4 cents per pound, whereas filler flock, like plaintiff's exhibit 4, would sell for between 12 and 14 cents per pound.

It appears from the official papers which are part of the record in this case that the collector invoked the provisions of paragraph 923, *supra*, for classification of the instant merchandise upon the theory that the waste cotton cuttings used to produce it can be garnetted into fibers fit for the ordinary uses of cotton and that the cotton fibers in the cuttings are readily recognizable and commercially known as cotton.

This theory presumptively derives from the decision of this court in the case of *Marathon Rubber Products, Inc.* v. *United States*, 64 Treas. Dec. 369, T. D. 46679, rehearing denied, 64 Treas. Dec. 1082, Abstract 26035, which involved the question of the proper classification of certain dyed cotton flock, invoiced as "Dechets de Coton." The record therein revealed that the subject merchandise was produced from a mixture of waste from a weaving and spinning mill and/or shearings from pieces of cotton goods, which raw material the parties stipulated to be cotton waste. It was ground and sifted in much the same fashion as the merchandise at bar, and also dyed. Both the classification by the collector and the contentions of the importer were the same as those in the present case, except that some of the merchandise, having been imported prior to June 17, 1930, was covered by comparable provisions of the Tariff Act of 1922.

In sustaining the alternative claim that the merchandise was dutiable as a nonenumerated article, manufactured in whole or in part, this court stated:

'We are satisfied from the stipulated facts herein, as supplemented by the testimony and the Government chemist's report, that the imported merchandise can no longer be regarded as cotton waste or waste in any sense of the word, having lost its identity as such by the manufacturing processes above referred to, which have transformed the material into a new article of a distinctive name, character, and use, namely, dyed cotton flock for applying to and finishing the surface of rubberized fabrics, and evidently for no other use. Note *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963.

The collector's classification of the merchandise as manufactures in chief value of cotton not specially provided for is undoubtedly based on the theory that as the ground or pulverized cotton fibers in the dyed cotton flock are presumably of chief value therein, it necessarily is a manufacture of cotton within the meaning of said tariff acts. This theory however seems to have its exception in the case of an article made from cotton or cotton waste material in which the cotton fiber or staple has lost its identity as commercial cotton and is no longer fit for spinning into threads or yarns or for weaving into fabrics. This we think is evident from the definition of "cotton" taken from Funk & Wagnalls' Standard Dictionary:

Cotton, *n.* 1. The soft, wooly, fibrous material which is appendant to the seeds of the cotton-plant. The fiber, white or yellow, and from two-thirds of an inch to two inches in length, is contained in a three or five-celled capsule or boll, which when ripe bursts open and allows it partially to escape. After it has been picked the seeds scattered through it are removed by the cotton-gin. The raw product of the plant is manufactured into cloth, thread, etc., and is commercially the most important of all staples. * * *

\* \* \* \* \* \* \*

An inspection of illustrative exhibit A in the present case, representing the cotton waste from which the imported cotton flock was manufactured, shows it to consist, in the main, of very small bunches of matted fragments of cotton fiber the staple length of which is hardly capable of being measured, although a few short broken threads are also present. Clearly it can no longer be regarded as commercial cotton or fit for the ordinary uses of cotton. Neither therefore can the dyed cotton flock in question be considered a manufacture of cotton within the tariff meaning, although undoubtedly it may be said to be a manufacture of a species of cotton waste known as shearings. It therefore follows that the collector's classification of the merchandise in these cases as a manufacture in chief value of cotton is untenable. Note also *Rossman* v. *United States,* 1 Ct. Cust. Appls. 280, T. D. 31321. If the dyed cotton flock in question had originated in the first instance from commercial cotton fiber and not from cotton waste such as illustrative exhibit A, a different conclusion would probably result. Note *Goldman* v. *United States,* 87 Fed. 193; *Nairn Linoleum Co.* v. *United States,* 151 id. 955.

The unimpeached testimony of plaintiff's two able witnesses clearly controverts the premise upon which the collector's classification rests. For the purposes of this case, in the absence of any evidence to the contrary, we must accept as having been established that the cotton cuttings used to produce the cotton flock in issue did not contain recoverable cotton fibers commercially suitable for use in cotton manufacture, or capable of being spun into cotton yarn or threads, by reason of color, shortness of fiber, and tightness of weave.

Under the circumstances, it becomes unnecessary to point out the differences in character between the cotton waste used to produce the cotton flocks in the *Marathon Rubber Products* case, *supra,* and the cotton cuttings which were converted into the cotton flock in the present case. It is sufficient to observe that, as the raw material was not cotton *per se,* the finished article may not properly be regarded as a manufacture of cotton within the purview of paragraph 923, *supra,* and the collector was in error in so classifying the instant importation.

We are of opinion that the decision in the *Marathon Rubber Products* case, *supra,* likewise disposes of plaintiff's contention that the merchandise at bar is cotton waste, advanced in value, within the purview of paragraph 901 (c) of the Tariff Act of 1930, *supra,* Assuming, without deciding, that the raw material used to produce this filler flock was cotton waste, a fact conceded in the cited case, but in issue here, the processes of grinding and sieving to which it has been

subjected have completely destroyed its character as such and have created a wholly new article, not adapted to any of the uses to which cotton waste can be applied.

Counsel for plaintiff, while acknowledging this principle, nevertheless urges that Congress, in providing for cotton waste, advanced in value, intended to cover any processing to which cotton waste may be subjected whether or not a new article, having a new name and uses, may result. This argument develops from the following statement in the 1948 Summaries of Tariff Information, volume 9, page 9:

* * * Cotton waste in the form in which it is produced is on the free list (par. 1662), but when it is bleached, dyed, *garnetted* or otherwise advanced in value it is dutiable under paragraph 901 (c). [Italics supplied.]

It is suggested that the process of garnetting mentioned in said Summaries of Tariff Information changes the identity of cotton waste and produces a new article essentially different from that of cotton waste. Hence, it is urged that *any* manipulation of cotton waste constituting an advancement thereof, regardless of result, and notwithstanding that a completely new article may be produced, is covered by the language of said paragraph 901 (c). The case of *A. N. Deringer, Inc.* v. *United States*, 30 Cust. Ct. 262, C. D. 1530, wherein short lengths of yarn, taken from spools holding warp threads and wound into balls, were held to be cotton waste, advanced, is cited to sustain this position.

We do not believe that, in the use of the phrase "Cotton waste, manufactured or otherwise advanced in condition" in paragraph 901 (c), *supra*, Congress intended so pervasive a construction as that for which plaintiff contends. The language of the paragraph presupposes that its subject shall be cotton waste, in a stage further advanced than the form in which it is produced, but, nevertheless, still cotton waste, recognizable as such. A process of advancement which destroys the identity of the material and, in so doing, produces a new article, bearing no relation to the substance out of which it is made, is something more than cotton waste, advanced. It is a manufacture of cotton waste to which this paragraph does not address itself. Since manufactures of cotton waste are not *eo nomine* provided for in the tariff act, they fall within the provisions of paragraph 1558, *supra*, as unenumerated manufactured articles.

As stated in *United States* v. *Geo. S. Bush & Co.*, 29 C. C. P. A. (Customs) 241, C. A. D. 197:

We are of the opinion that the alleged silk threads or yarns have been advanced by a process of manufacture beyond any stage of advancement where they still remain silk yarns or threads of any description. They have ceased to be threads and yarns and have become something more. They are finished articles dedicated to a new class of uses. We think Congress in enacting paragraph 1204 intended, notwithstanding its use of the term "any process of manufacture,"

to include therein only those articles named which had not been advanced by any process of manufacture to a point where their ordinary use and name had been changed. No one would think of calling the leader material and fishing lines at bar threads or yarns, regardless of whatever name might have been applied to them before they had been advanced into their finished condition. A study of the context of paragraph 1204 discloses that a duty of not less than 35 per centum was imposed upon the articles named, including silk threads and yarns if they were in the gum, but if they were ungummed wholly or in part "or if further advanced by any process of manufacture" they took the rate of not less than 40 per centum ad valorem. Ungumming was an advancement which raised them from a duty of not less than 35 per centum to a duty of not less than 40 per centum. Ungumming is an illustration of an advancement which was in the mind of Congress. Is it conceivable that it contemplated that any of the articles named in the paragraph might be so advanced by any process, such as the coating as in the instant case, which produced a new and wholly different article in character and use, and still remain in the paragraph for duty purposes? We think not.

In this analysis rests the distinction between the commodity involved in the *Deringer* case, *supra*, and that the subject of this action. There, the process of winding the loose warp ends of ply yarn merely put cotton waste into another form, more useful for the purpose of manufacture into cheap mops for rough cleaning, but, nevertheless, still retaining its indentity as ply yarn cotton waste. Here, the grinding and sifting operations effected a total transformation. In producing the new article, cotton filler flock, the identity of the raw material, cotton cuttings, has been absolutely destroyed. The latter enbodies none of the characteristics of the former and gives no evidence of the substance from which it has been derived.

In view of the foregoing considerations, the claim of the plaintiff for classification of these importations within the provisions of paragraph 1558, *supra*, is sustained. Duty shall be assessed at the rate of 20 per centum ad valorem, as therein provided, with respect to entry 740951, and at the rate of 10 per centum ad valorem, pursuant to the modification of said paragraph, *supra*, with respect to entry 751528. All other claims are, however, overruled.

Judgment will be entered accordingly.